# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| ALICE J. GRAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:08-CV-00167 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Alice Gray appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in accordance with this Opinion.

## I. PROCEDURAL HISTORY

Gray applied for DIB on July 9, 2003, alleging that she became disabled on May 31, 2000. (Tr. 101-04.) The Commissioner denied her application initially and upon reconsideration, and Gray requested an administrative hearing. (Tr. 87-97.) On January 12, 2006, Administrative Law Judge (ALJ) Frederick McGrath conducted a hearing at which Gray (who was represented by counsel), her husband, and a vocational expert ("VE") testified. (Tr. 54-86.)

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

On October 12, 2006, the ALJ rendered an unfavorable decision to Gray, concluding that she was not disabled despite the limitations caused by her impairments because she could perform a significant number of jobs within the economy. (Tr. 26-34.) After a timely request for review, the Appeals Council issue a partially-favorable final decision to Gray, finding that she was disabled as of her fifty-fifth birthday on November 30, 2005, but not before that date. (Tr. 6-16.)

Gray filed a complaint with this Court on July 10, 2008, seeking relief from the portion of the Commissioner's final decision declaring that she was not disabled prior to November 30, 2005. (Docket # 1.) Thus, Gray seeks an award of disability for the period beginning May 31, 2000, through November 29, 2005.

## II. GRAY'S ARGUMENTS

Gray alleges essentially three flaws with the Commissioner's final decision. Specifically, she claims that the ALJ: (1) failed to accurately incorporate all of the mental limitations he identified at step three into the residual functional capacity ("RFC") and the hypothetical posed to the VE at step five; (2) improperly evaluated the opinions of Dr. Bledsoe, her treating family physician; Dr. Bacchus, an examining physician; Dr. Pancner, her treating psychiatrist; and Dr. Martin, an examining psychologist; and (3) improperly evaluated the credibility of her symptom testimony. (Opening Br. of Pl. in Social Security Appeal ("Opening Br.") 12-21.)

## III. FACTUAL BACKGROUND[2]

### *A. Background*

At the time of the ALJ's decision, Gray was fifty-five years old; had a ninth grade education; and possessed work experience as a certified nursing assistant, home health aide, program coordinator, cutter, and mattress maker. (Tr. 57-60, 81, 101, 122, 127, 176.) Gray alleges that she became disabled due to the following impairments: cervical and lumbar degenerative disk disease, right hip degenerative arthritis, major depressive disorder, mild ulner neuropathy, colon cancer in remission, and small vessel disease. (Opening Br. 2.)

At the time of the hearing, Gray testified that it takes her a "couple [of] hours" to get dressed in the morning. (Tr. 71.) Her husband further stated that she performs household chores very slowly, takes frequent rest periods thirty to forty minutes in length, and often does not finish the tasks. (Tr. 78-80.) He stated that while Gray prepares breakfast (which takes her ninety minutes), he prepares the other meals and finishes her housekeeping chores. (Tr. 78-79.)

When asked to describe her physical capacity, Gray stated that she can stand for thirty minutes at a time, sit for a maximum of two hours at a time, walk one to two blocks before needing to stop, and that she can no longer operate foot controls. (Tr. 66-67.) She stated that she has pain in her lower back and down her right leg, "[s]ometimes stabbing, sometimes, dull, [and] sometimes sharp" (Tr. 68), and that the pain often wakes her up at night. (Tr. 70.) To relieve her pain, Gray takes pain medication (Vicoden) three to four times a day, uses a heating pad, and reclines or lies down, often for two to three hours at a time. (Tr. 68-69.)

As to her mental health, Gray testified that her depression causes her difficulty and that

---

[2] The administrative record in this case is voluminous (542 pages). Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

she experiences flashbacks from childhood trauma. (Tr. 71-72.) She confided that she does not want to be bothered with other people, particularly her extended family, and prefers to "just lay down"; she avoids larger crowds of people. (Tr. 72.) She stated that there are some days that she may "feel fine" emotionally, but that about four or five times a month she stays in bed all day due to her depression. (Tr. 73-74.) Her husband noted that she has a lot of mood swings and that she is forgetful. (Tr. 80.)

B. *Summary of the Medical Evidence*

Gray visited Dr. Bhupendra Shah, a neurologist, from December 1998 to April 2000 for a several year history of low back pain triggered by a fall at work. (Tr. 189-97.) An MRI showed evidence of minor degenerative changes at the L3-4 level. (Tr. 196.) In 1999, Gray reported severe back pain and difficulty with sitting, and she was taken off work and went to physical therapy; she returned to work one month later. (Tr. 193-95.)

On September 3, 2001, Gray was briefly hospitalized for unstable angina, anxiety, and hypokalemia, but testing was negative for heart disease. (Tr. 201-03.) In July 2002, she saw a cardiologist for complaints of heart palpitations. (Tr. 240.)

In May 2003, x-rays of Gray's lumbar spine revealed minimal dextroscoliosis and degenerative endplate changes, but was otherwise unremarkable; an MRI demonstrated relatively mild multi-level degenerative disk changes, with the most pronounced findings at L3-4, and mild acquired central stenosis. (Tr. 363, 365.) X-rays of her right hip showed moderate degenerative arthritic changes. (Tr. 364.) The next month, Gray again underwent physical therapy for her low back. (Tr. 267.)

Gray saw Dr. H.M. Bacchus for a physical consultative exam in August 2003. (Tr. 268-

4

71.) He diagnosed probable degenerative disk disease and/or degenerative joint disease of the cervical and lumbosacral spines, hypertension, and chronic depression and anxiety. (Tr. 270.) Dr. Bacchus opined that Gray retained the RFC to perform "light full time duties, 6 hours sitting and 2 hours standing, noncontinuous, lifting 8-10#."[3] (Tr. 270.)

On September 19, 2003, Gray underwent a consultative psychological examination by Candace Martin, Ph.D. (Tr. 272-75.) She diagnosed Gray with recurrent major depressive disorder, panic disorder without agoraphobia, and probable borderline intellectual functioning, and assigned her a Global Assessment of Functioning ("GAF") score of 55.[4] (Tr. 275.) Dr. Martin opined that Gray was not likely to be capable of gainful employment in the immediate future because she seemed to be unaware of the seriousness of her loss of weight and poor physical maintenance. (Tr. 275.) Dr. Martin noted that Gray seemed unable to care for herself adequately, much less care for her aged mother who Gray stated resides with them. (Tr. 275.) She further observed that Gray's ability to focus attention and concentration appeared quite weak and that she might have difficulty with time constraints on performance demands. (Tr. 275.)

Gray attended approximately eight mental health counseling sessions with Liz McGinnis, a mental health therapist, at Psychiatric Care, Inc., between August 2003 and January 2004. (Tr. 277-93.) Ms. McGinnis diagnosed her with dysthymic disorder. (Tr. 293.)

---

[3] Although Dr. Bacchus referred to "light" duties in his opinion, the limitations he assigned are actually consistent with the performance of sedentary work, not light work, under the Social Security regulations. *See* 20 C.F.R. § 404.1567; SSR 83-10.

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id*. A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

Between August 2003 and October 2004, Gray had approximately eight visits with Dr. Eric Jenkinson, a physiatrist. (Tr. 295-306, 412-22.) In August 2003, Gray saw Dr. Jenkinson for low back pain; he diagnosed degenerative disk disease, prescribed medication, and recommended Gray receive an epidural block, which she did. (Tr. 300-02.) In January 2004, Gray reported intermittent neck problems and upper extremity pain to Dr. Jenkinson. (295-96.) After an MRI, he diagnosed her with cervical degenerative disk with spondylolysis with some radicular symptoms, as well as lumbar radicular symptoms. (Tr. 296, 527.) Two months later, Gray complained to Dr. Jenkinson of leg pain; he diagnosed her with osteoarthritis of the right hip, and she received several lumbar and intra-articular hip injections, which gave her some relief. (Tr. 411-20.)

In October 2003, Dr. T. Crawford, a state agency physician, reviewed Gray's record and concluded that she could perform light exertional work with occasional postural movements. (Tr. 307-15.) A second state agency physician later affirmed Dr. Crawford's opinion. (Tr. 315.) That same month, Dr. J. Gange, a state agency psychologist, reviewed Gray's record and opined that Gray did not have a severe mental impairment. (Tr. 318-37.) A second state agency psychologist later affirmed Dr. Gange's opinion. (Tr. 336.)

In June 2004, Gray visited Dr. Ronald Pancner, a psychiatrist, and Ms. Ruen, a licensed social worker. (Tr. 407-10.) They diagnosed her with major depression, moderate, and assigned her GAF scores of 50 and 55. (Tr. 404-10.) Between June 2004 and May 2005, Gray saw Ms. Ruen for approximately eight counseling sessions. (Tr. 469-72, 474, 476-78, 539.)

In March 2005, Gray was evaluated by Dr. William Young of the NeuroSpine and Pain Center. (Tr. 494-96.) Gray underwent MRIs and electrophysiologic testing; the findings

6

suggested bilateral ulnar neuropathy at the elbow, mild degenerative changes of her spine and hip, and areas of increased signal intensity on her brain. (Tr. 484-85, 488-89.)  Dr. Young referred Gray to Dr. Chang, a neurologist, who thought that the results of Gray's MRI of her brain were most consistent with a moderate amount of small vessel disease. (Tr. 482, 485.)  He recommended blood work, aspirin therapy, and an exercise program. (Tr. 482.)

In September 2005, Dr. Bledsoe, Gray's family physician, opined that Gray could lift less than ten pounds occasionally, stand or walk less than two hours in an eight-hour workday, and must periodically alternate sitting and standing to relieve pain or discomfort. (Tr. 512-14.)  He also stated that Gray had postural, manipulative, and environmental limitations, in that she should avoid temperature extremes because of hand and finger numbness and weakness, as well as heights and machinery due to poor balance. (Tr. 513-14.)  He identified degenerative disk disease as evidenced on her MRI as the clinical findings supporting his limitations. (Tr. 513.)

## IV.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## V.  ANALYSIS

### A.  *The Law*

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5)

whether the claimant is incapable of performing work in the national economy.[5] *See* 20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

On October 12, 2006, the ALJ rendered his decision. (Tr. 26-34.) He found at step one of the five-step analysis that Gray had not engaged in substantial gainful activity since her alleged onset date. (Tr. 28.) At step two, he concluded that Gray had the following severe impairments: disorders of the spine, colon cancer, chronic obstructive pulmonary disease, heart problems, depression, and panic disorder. (Tr. 28.) The ALJ then at step three determined that Gray's impairment or combination of impairments was not severe enough to meet a listing. (Tr. 28.) Before proceeding to step four, the ALJ found Gray's subjective complaints "not entirely credible" and assigned her the following RFC:

> [T]he claimant ha[s] the residual functional capacity to perform light work that does not involve more than simple, routine, and repetitive work. She [is] able to lift and carry twenty pounds occasionally and ten pounds frequently. In an eight-hour period, the claimant [is] able to sit or stand/walk for a total of six hours each.

(Tr. 28.)

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

9

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Gray was unable to perform her past relevant work. (Tr. 33.) The ALJ then concluded at step five that Gray could perform a significant number of other jobs that constituted light work within the economy, including electrical assembler, production assembler, and laundry folder. (Tr. 33-34.) Therefore, Gray's claim for DIB was denied. (Tr. 34.)

### C. The ALJ Erred By Failing to Incorporate Gray's Mental Limitations Into the RFC and the Hypothetical Posed to the VE

Gray argues that the ALJ failed to accurately incorporate his findings about her mental limitations into the RFC and the hypothetical posed to the VE at step five. Gray's argument ultimately has merit under Seventh Circuit case law and warrants a remand of the Commissioner's final decision.

To explain, in determining the severity of a claimant's mental impairment, the ALJ must address a claimant's degree of functional limitation in four "broad functional areas": activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3); *see, e.g.*, *Jones v. Massanari*, No. 01-C-0024-C, 2001 WL 34382025, at *13 (W.D. Wis. Oct. 18, 2001). The Seventh Circuit Court of Appeals has stated that the ALJ must then "incorporate" these limitations into the hypothetical questions posed to the VE at step five. *Kasarsky v. Barnhart*, 335 F.3d 539, 543-44 (7th Cir. 2003) (holding that the ALJ erred when neither his RFC nor his hypothetical question to the VE "[took] into account" his finding at step two that the claimant had deficiencies in concentration, persistence, or pace); *see also Stewart v. Astrue*, __ F.3d __, 2009 WL 859830, at *3 (7th Cir. Apr. 2, 2009). Stated more broadly, "to the extent the ALJ relies on testimony from a vocational expert, the question posed to the expert must incorporate *all* relevant limitations from which the

10

claimant suffers." *Kasarsky*, 335 F.3d at 543 (emphasis added); *see also Stewart*, 2009 WL 859830, at *3 ("When an ALJ poses a hypothetical question to a vocational expert, the question must include all limitations supported by medical evidence in the record.").

Here, at step three of his analysis, the ALJ found that Gray had moderate deficiencies in activities of daily living; social functioning; and concentration, persistence, or pace. (Tr. 33.) Yet, the RFC and the hypothetical question posed by the ALJ to the VE did not expressly incorporate these findings, instead limiting Gray to "simple, routine, repetitive tasks." (Tr. 82; *see also* Tr. 28.) The Commissioner argues that the ALJ's limitation adequately accommodates Gray's mental health deficits. Gray disagrees; she contends that the ALJ's failure to incorporate her moderate limitations in social functioning and concentration, persistence, or pace into the hypothetical posed to the VE, left the VE with an incomplete picture of her actual limitations.

"[A]n ALJ is free to formulate his mental residual functional capacity assessment in terms such as 'able to perform simple, routine, repetitive work' so long as the record adequately supports that conclusion." *O'Connor-Spinner v. Astrue*, No. 4:06-CV-0171-DFH-WGH, 2007 WL 4556741, at *7 (S.D. Ind. Dec. 20, 2007) (quoting *Kusilek v. Barnhart*, No. 04-C-310-C, 2005 WL 56716, at *4 (W.D. Wis. Mar. 2, 2005) (internal quotation marks omitted)). That is, courts have held that when a medical source of record translates his findings into a particular RFC assessment, the ALJ may reasonably rely on that opinion in formulating a hypothetical question for the VE. *Id.*; *see, e.g.*, *Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002) (concluding that the ALJ's limitation to low-stress, repetitive work adequately incorporated the claimant's moderate mental limitations because the consulting physician had essentially "translated [his] findings into a specific RFC assessment, concluding that [the claimant] could

11

still perform low-stress, repetitive work."); *Howard v. Massanari*, 255 F.3d 577, 581-82 (8th Cir. 2001) (concluding that the ALJ adequately captured the claimant's deficiencies in concentration, persistence, or pace in his RFC that limited the claimant to simple, repetitive tasks, in part because the state agency psychologist concluded in his functional capacity assessment that the claimant could sustain sufficient concentration and attention to perform simple, repetitive, and routine activity); *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001) (finding that the ALJ's limitation of plaintiff to work that is "routine and low stress" as recommended by one medical source of record adequately accounted for the fact that plaintiff often suffered from deficiencies in concentration, persistence, or pace).

This, however, is *not* a case where the ALJ relied upon a medical source's translation of Gray's moderate mental health deficits into a specific RFC finding. To explain, Dr. Martin, the consulting psychologist, thought that Gray was "not likely to be capable of gainful employment in the immediate future" (Tr. 275), and Dr. Pancner, Gray's treating psychiatrist, opined that the mental demands of work would exacerbate her mental functioning and that her absenteeism would prevent competitive employment. As to the state agency psychologists, they thought that Gray had only mild mental limitations and did not translate their findings into a specific RFC at all; the ALJ, however, ultimately concluded that Gray's mental deficits were *more severe* than those articulated by the state agency physicians, finding that she had moderate limitations.

Thus, the Court in its review of the record noted no medical source opinion that translated Gray's moderate mental health deficits into an RFC of simple, routine, or repetitive tasks; therefore, the ALJ obviously created this limitation of his own accord. "Framing hypothetical questions that seem to tell the vocational expert what types of work a claimant

12

could perform rather than incorporating the claimant's limitations in the questions and allowing the expert to draw [his] own conclusions is obviously a problematic practice." *O'Connor-Spinner*, 2007 WL 4556741, at *8; *see Young v. Barnhart*, 362 F.3d 995, 1004 n.4 (7th Cir. 2004) (finding that the ALJ's hypothetical was flawed "in that it purported to tell the vocational expert what types of work [the claimant] could perform rather than setting forth [the claimant's] limitations and allowing the expert to conclude on his own what types of work [the claimant] could perform"); *see also Stewart*, 2009 WL 859830, at *3. "The practice creates the risk that an incomplete hypothetical question, not sufficiently incorporating all of the claimant's actual limitations supported by substantial evidence in the record, will lead the vocational expert to find a significant number of jobs in the regional and national economy that the claimant could not actually perform." *O'Connor-Spinner*, 2007 WL 4556741, at *8.

Furthermore, while the ALJ may well have intended his limitation of Gray to "simple routine, and repetitive work" to accommodate her deficits in concentration, persistence, or pace, it does *not* account for his finding that Gray had moderate deficits in social functioning. *See Young*, 362 F.3d at 1004 (remanding case where ALJ failed to adequately account for claimant's social limitations in his RFC); *Richardson v. Astrue*, No. 1:08-cv-142-SEB-DML, 2009 WL 799543, at *6 (S.D. Ind. Mar. 23, 2009) (same). As emphasized *supra*, when an ALJ relies on a VE's testimony, the hypothetical questions based on the claimant's RFC must incorporate *all* of the claimant's limitations that are supported by medical evidence in the record. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004).

Of course, it is possible that there is an explanation for the omission of the ALJ's finding with respect to Gray's deficiencies in social functioning and concentration, persistence, or pace

in the hypothetical posed to the VE. That is, perhaps the ALJ never meant to find that Gray experiences any work-related limitation due to her moderate limitations in social functioning and concentration, persistence, or pace. *See Kasarsky*, 335 F.3d at 544. Yet, we have no way of knowing that at this juncture, *see Hemphill v. Barnhart*, No. 01 C 6556, 2002 WL 1613721, at *8 (N.D. Ill. July 18, 2002) ("[N]o court should be forced to engage in speculation as to the reasons for an ALJ's decision." (citations omitted)), and the VE clearly stated that there would be no work for a hypothetical individual with all of the limitations that Gray claimed, which include a limited ability to concentrate and deal with the public. (Tr. 85-86); *see Kasarsky*, 335 F.3d at 544.

Consequently, this case will be remanded to the Commissioner so that the ALJ may properly incorporate all of the limitations that he articulated at step three into his step-five analysis. *See Kasarsky*, 335 F.3d at 544.

*D. The ALJ's Consideration of the Medical Source Opinions of Record Will Be Remanded*

Gray also argues that the ALJ improperly considered the opinions of Dr. Bledsoe, her treating family physician; Dr. Pancner, her treating psychiatrist; Dr. Bacchus, an examining physician; and Dr. Martin, an examining psychologist. Gray's argument is persuasive.

Here, as to Gray's physical capacity, Dr. Bledsoe stated that Gray could lift less than ten pounds and stand or walk less than two hours in an eight-hour workday, citing clinical findings of degenerative disk disease as evidenced by an MRI. Likewise, in reliance on his physical examination, Dr. Bacchus opined that Gray could sit for six hours and stand for two hours and that she could lift eight to ten pounds. Both of these opinions are reflective of the requirements of sedentary work, *not* light work. Of course, under the Grid Rules, an individual such as Gray who is

14

"closely approaching advanced age" (that is, fifty to fifty-four years old) during the period in question, has no college education, and whose previous work experience was unskilled, is automatically deemed disabled if she is limited to sedentary work. *See Wirth v. Barnhart*, 318 F. Supp. 2d 726, 731 (E.D. Wis. 2004) (citing 20 C.F.R. Pt. 404, App. 2, Subpt. P § 202.12).

And, with respect to Gray's mental health, Dr. Pancner noted that the mental demands of work would exacerbate Gray's mental problems and cause absenteeism, and Dr. Martin articulated that Gray was "not likely to be capable of gainful employment in the immediate future." (Tr. 275.) Therefore, these two mental health opinions are inconsistent with the performance of *any* competitive work.

The ALJ rejected the opinions of these four treating and examining physicians and chose instead to favor the opinion of the state agency physicians, who opined that Gray could, from a physical capacity perspective, perform light work. (Tr. 29-30.) In rejecting the treating and examining physicians' opinions, however, the ALJ simply recited in a conclusory manner that the opinions were each "inconsistent with the objective medical evidence" and Gray's daily living activities. (Tr. 30, 32.) Thus, the ALJ did not to point to specific examples of medical evidence that were inconsistent with the treating and examining physicians' opinions. This constitutes legal error, as "the ALJ must . . . explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 354 (7th Cir. 2005). *Compare Ulloa v. Barnhart*, 419 F. Supp. 2d 1027, 1036 (N.D. Ill. 2006) (remanding the ALJ's decision where he stated that a physician's opinion was inconsistent with the objective medical evidence and the overall record but failed to explain *how* it was inconsistent); *Singleton v. Astrue*, No. 3:06-CV-0760-CAN, 2008 WL 425528, at *5 (N.D. Ind. Feb. 13, 2008) (finding that the ALJ

did not adequately articulate his reasoning for discounting certain physicians' opinions where he "cited no medical evidence and, more importantly, did not explain how such evidence contradicted their opinions"), *with Hudson v. Soc. Sec. Admin.*, No. 3:07-CV-117 CAN, 2008 WL 474207, at *5 (N.D. Ind. Feb. 19, 2008) (affirming the ALJ's decision to discount a physician's opinion where the ALJ specifically referred to particular parts of the physician's opinion as evidence that inconsistencies existed to support his conclusion).

Furthermore, the ALJ rejected Dr. Bledsoe's and Dr. Bacchus's opinions on an additional basis that appears dubious. In that respect, the ALJ claimed that Dr. Bledsoe's and Dr. Bacchus's opinions "do not contain findings that support a conclusion that the claimant is not able to perform light work." (Tr. 30.) Yet, Dr. Bledsoe specifically cited Gray's degenerative disk disease and her MRI results as clinical findings to support the prescribed limitations, and Dr. Bacchus grounded his opinion in the results of his physical examination of Gray. Thus, these physicians did indeed support their lifting, standing, and walking limitations with specific, objective clinical findings. *Compare Brumfield v. Astrue*, No. 06-cv-947-JPG, 2008 WL 878196, at *3 (S.D. Ill. Mar. 28, 2008) (finding the ALJ's rejection of a physician's opinion "unreasonable" where the opinion was adequately supported by medical evidence), *with Smith v. Apfel*, 231 F.3d 433, 441 (7th Cir. 2000) (affirming the ALJ's discounting of a physician's opinion where the physician provided *no* objective medical basis in clinical signs, findings, or abnormalities to substantiate his indicated restrictions).

Therefore, upon remand, the ALJ is also directed to re-examine the medical source opinions of record in accordance with 20 C.F.R. § 404.1527, and adequately articulate his reasoning with

16

respect thereto, *Briscoe*, 425 F.3d at 354.[6]

## VI. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion. The Clerk is directed to enter a judgment in favor of Gray and against the Commissioner.

SO ORDERED.

Enter for this 1st day of May, 2009.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge

---

[6] Because a remand is warranted on Gray's arguments discussed *supra*, the Court does not need reach her remaining contentions.